1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MILA IRAKUNDA,

                                        Petitioner,

v.

B. CATES, Acting Warden, et al.,

                                        Respondents.

Case No. 20cv1870-MMA (BGS)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

Mila Irakunda ("Petitioner"), a state prisoner proceeding *pro se*, has file a petition for writ of habeas corpus challenging his state court conviction and sentence pursuant to 28 U.S.C. § 2254.  *See* Doc. No. 1.  Respondent has filed an Answer and a Notice of Lodgment of the state court record.  *See* Doc. Nos. 6-7.  Petitioner has not filed a Traverse.  For the reasons set forth below, the Court **DENIES** the petition and **DECLINES** to issue a certificate of appealability.[1]

## I.    Background

Petitioner was convicted in the San Diego County Superior Court of assault with a deadly weapon with the personal use of a deadly weapon and personal infliction of great

---

[1]  Although this case was referred to United States Magistrate Judge Bernard G. Skomal pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter.  *See* CivLR 71.1(d).

bodily injury and sentenced to seven years in state prison.  *See* Doc. No. 7-1 at 179, 183.
He claims here, as he did in state court, that his federal constitutional rights were violated
by the failure to give a jury instruction on mutual combat (claim one), by the imposition
of restitution fines and court fees without a finding of his ability to pay (claim two), and
by ineffective assistance of trial counsel for objecting to the use of a mutual combat jury
instruction (claim three).  *See* Doc. No. 1 at 6-8.

Respondent answers that habeas relief is unavailable because claims one and two
are procedurally defaulted and do not present cognizable federal claims, and because the
state court adjudication of claims one and three is neither contrary to, nor an
unreasonable application of, clearly established federal law, nor based on an
unreasonable determination of the facts in light of the evidence presented in state court.
*See* Doc. No. 6-1 at 11-24.

## II.    State Court Proceedings

On April 2, 2018, a jury found Petitioner guilty of assault with a deadly weapon.
*See* Doc. No. 7-1 at 179.  The jury returned true findings he personally used a dangerous
and deadly weapon, a knife, and personally inflicted great bodily injury in the
commission of that offense.  *Id.*  On May 10, 2018, he was sentenced to seven years in
prison, consisting of four years on the assault conviction plus a consecutive term of three
years on the personal infliction of great bodily injury finding, along with $4200 in
restitution fines and $224 in court fees.  *Id.* at 183.

Petitioner appealed, raising the same claims presented here.  *See* Doc. No. 7-13.
The appellate court affirmed.  *See* Doc. No. 7-19, *People v. Irakunda*, D074094, slip op.
(Cal. App. Ct. July 17, 2019).  It found the instructional error claim was procedurally
barred by the invited error doctrine because defense counsel objected to a mutual combat
instruction, and that the default could not be excused by ineffective assistance of counsel
because counsel had a tactical reason for not wanting the instruction, that it would
undermine the defense theory of self-defense.  *Id.* at 6-9.  The court found the claim
alleging a lack of findings of an ability to pay fines and fees was forfeited by a failure to

object at sentencing.  *Id*. at 9-10.  Petitioner presented the same claims to the state supreme court in a petition for review which was summarily denied on September 25, 2019.  *See* Doc. Nos. 7-20, 7-21.

## III.   Evidence Presented at Trial

Akelewene Abella testified that he had a speaker in his apartment which he decided to sell or give away because his neighbors complained it was too loud.  *See* Doc. No. 7-6 at 39.  About two weeks before January 1, 2018, Petitioner, who Abella had known for only a few months, offered to trade a watch for the speaker, and they did so on good terms.  *Id*. at 37-41.  Abella said he never drove Petitioner's car, a silver Suzuki, but Petitioner occasionally gave him a ride to work, as Abella did not have a car and took the bus to his job as a chef.  *Id*. at 40; Doc. No. 7-7 at 40.

On December 31, 2017, Petitioner called Abella several times at work and left messages.  *See* Doc. No. 7-6 at 41.  Abella called Petitioner while returning home from work and they agreed to meet at a bus stop near Abella's apartment.  *Id*. at 41-42.  About 1:00 a.m. on January 1, 2018, Abella got into the back seat of Petitioner's car behind Petitioner, who was driving, with a woman Abella did not know in the front passenger seat.  *Id*. at 42.  Petitioner told Abella he wanted to take back the watch he traded for the speaker and give him a different watch but did not say why.  *Id*. at 43.  Abella agreed to give Petitioner his watch if Petitioner returned the speaker or the same kind of speaker, and Petitioner "drove off looking for the same speaker as mine." *Id*. at 44.  They drove around for about an hour with Petitioner trying to find a speaker while the passenger slept, during which Petitioner became angry Abella would not give him the watch.  *Id*. at 44-45.  At some point they drove past Abella's house and he asked to get out because he was tired from working twelve hours, but Petitioner refused to stop.  *See* Doc. No. 7-7 at 43.  The passenger woke up when Petitioner and Abella were arguing with raised voices, and at some point, they picked up a man Abella did not know who sat beside him in the back seat of the car.  *Id*. at 16; Doc. No. 7-6 at 45.

Petitioner could not find a speaker and eventually stopped the car in a dark area

unfamiliar to Abella. *See* Doc. No. 7-6 at 46-47. When Petitioner told Abella to get out he refused because he did not know where they were. *Id*. at 46. Petitioner, who Abella said is physically larger, got out of the car, opened Abella's door, grabbed his leg, hit him in the feet with something like a screwdriver, and told him "he's going to teach me a lesson." *Id*. at 46-51. Abella, who had nothing in his hands, got out of the car and began looking for something in the area, which looked like a construction site, to use to defend himself against Petitioner's screwdriver, and picked up a very light, two-foot-long plastic water pipe about the width of his thumb. *Id*. at 52-53. He held the pipe in a defensive manner about ten to fifteen feet away from Petitioner but did not swing it at Petitioner. *Id*. at 54-55. Petitioner went to the car, grabbed a "military" knife, and came straight back at Abella. *Id*. at 55-56. Abella dropped the pipe and backed away as Petitioner advanced swinging the knife saying: "I'll show you. I'm gonna teach you a lesson." *Id*. Abella was backing away with his arms raised out chest-high with open hands when Petitioner stabbed his left forearm with the knife. *Id*. at 58-59. Abella continued backing away, tripped on a curb and fell on his back. *Id*. at 60-61. Petitioner was saying: "I need my watch," "If you don't give me the watch, I will finish you" and: "I won't leave without my watch." *Id*. at 62-63. Abella threw the watch in the street and Petitioner picked it up. *Id*. at 64. People sitting on a porch of a nearby house ran toward them and called 911, prompting Petitioner to run to his car and drive away. *Id*. at 65-66; Doc. No. 7-7 at 16-17.

Abella identified Petitioner to the police by the nickname "Cash Man," the only name he knew for Petitioner. *See* Doc. No. 7-6 at 67. He said he had known Petitioner about two and one-half months at that time, and that the two other people in the car, who he did not know, never got out of the car. *See* Doc. No. 7-7 at 16-17. He identified the knife Petitioner used from a photograph shown him in court. *Id*. at 24. He was taken to a hospital where he underwent surgery and it was a month before he could move his fingers and use his arm, which prevented him for working, and he was still in pain and did not have full use of his arm at the time of trial. *Id*. at 29-32.

Quincy Parrish testified he was on the porch of a house at a party when he heard loud voices and saw two men arguing. *Id*. at 79-83. He decided to be "nosy" and walked over to see what was happening. *Id*. at 83-84. He was about 90 feet away when he called: "Hey, you guys alright?", which appeared to startle one of the men who "took off" running to a car parked about a block away and entered on the passenger side. *Id*. at 84-86, 89-90. Parrish said he had been drinking and the lighting was poor, so he was not able to give a good description of the person who ran away. *Id*. at 85. The other man, who had been stabbed, "keeled over," and Parrish told him to calm down so he would not bleed out. *Id*. at 87-88. Parrish said that with the help of others from the party they brought him to the porch of the house, took off his jacket, saw a "pretty bad gash" in his arm and called the police. *Id*. at 89.

Stephen Varns, a San Diego Police Officer, testified that at 3:00 a.m. on January 1, 2018 he responded to a radio call of a stabbing victim. *Id*. at 105-06. He found Abella with a four-inch cut on his left forearm wrapped in cloth which had been bleeding heavily. *Id*. at 107-08. Medics arrived and took Abella to the hospital where he gave Officer Varns a statement to the effect that: (1) a man he knew as Cash Man had traded his watch for Abella's speaker but had asked for his watch back earlier that day and had picked him up and drove him around until they arrived at an unfamiliar area where Cash Man demanded the watch; (2) Abella told Cash Man he wanted his speaker but Cash Man said he did not have it and pulled a military-style knife and started to swing it at Abella when he refused to give up the watch; (3) Abella said he thought Cash Man was kidding and began backing away and was slashed by the knife when he raised his arm to block the swinging knife;, and (4) Abella took the watch off and gave it to Cash Man and ran away, but Cash Man chased him until some people at a nearby house asked what was going on which caused Cash Man to run away. *Id*. at 109-12.

William Armstrong, a San Diego Police Officer, testified that on December 21, 2017, he and his partner were contacting transients on the south side of Colina Park when they approached Petitioner standing outside the passenger side of a parked silver car

registered to him. *Id*. at 121-23.  Officer Armstrong photographed and returned to Petitioner a military-style knife he found in a driver-side door panel which was not illegal to possess. *Id*. at 122.  That photograph was the one Abella identified in court as the knife Petitioner used to cut him. *Id*.; Doc. No. 7-6 at 24.

Mitchel Tani, a San Diego Police Officer, testified that on the evening of January 3, 2018, he and his partner were on patrol and saw Petitioner's silver Suzuki vehicle parked in an apartment complex carport. *See* Doc. No. 7-7 at 126-27.  There were two males inside who crouched down as the officers approached. *Id*. at 129.  Officer Tani knew Petitioner because he was with Officer Armstrong on December 21, 2017, and he was aware Petitioner was being sought in connection to a stabbing. *Id*. at 126-27.  Petitioner was arrested and a fixed-blade knife was recovered from a panel in the driver-side door. *Id*. at 130-31.  Petitioner had a two-inch scratch on his left cheek, a scratch on his left hand and a scab on his left forearm. *Id*. at 132.  The People rested. *Id*. at 148.

Petitioner testified with the aid of a Swahili interpreter that he has known Abella since 2014, that they are friends, and he considers Abella to be like a brother. *Id*. at 165-66.  Petitioner occasionally loaned Abella his car, including for three months from September to November 2017, and said Abella stole a watch from his car on December 30, 2017. *Id*. at 166-67.  The watch was sitting on the center console as Petitioner had stopped wearing it since it had a cracked screen. *Id*. at 167-68.  On the morning of December 31, 2017, just after Abella left for work on the bus, Petitioner went to look for the watch and noticed it missing. *Id*. at 168-70.  He called Abella at work who admitted taking the watch and agreed to return it later that day when he came home from work. *Id*. at 172.

Petitioner and Abella met at Petitioner's parked car when Abella came home from work in the early hours of January 1, 2018. *Id*. at 172-73.  Petitioner told him he wanted the watch back because its blue color matched his shoes, and that he was willing to sell Abella one of two other watches. *Id*. at 174-76.  They could not agree on a price for those watches and Abella asked to buy the blue watch. *Id*. at 177.  Abella begged

Petitioner to sell him the blue watch and offered to pay $20 immediately and $40 later, which Petitioner refused. *Id.* at 177-79. Abella said he was going to keep the watch and "started talking about things from the past that had already ended," such as loaning Petitioner a Bluetooth speaker about a month earlier to take the place of a speaker in Petitioner's car which Abella had ruined when he borrowed the car for three months. *Id.* at 179-82. Petitioner said Abella had also damaged the car and its radio and had agreed to pay to have them fixed as soon as he was paid, but later told Petitioner he would not pay to fix the car until Petitioner paid for the lost Bluetooth speaker. *Id.* at 180-82. Abella was aware his Bluetooth speaker had been stolen from Petitioner's car, and Petitioner offered to buy a new speaker if Abella would pay to fix the damage to the car and return the watch. *Id.* at 181, 184. They agreed and drove around looking for a speaker. *Id.* at 186. At Colina Park, Petitioner's friend Shango had a Bluetooth speaker which Abella refused to accept because it was smaller than his, and Shango said given time he could find an exact match based on a photograph on Abella's phone. *Id.* at 187-88. That seemed to satisfy Abella, and they drove off to continue drinking and celebrating the new year. *Id.*; Doc. No. 7-8 at 6-7.

They were parked with Abella, Shango and Petitioner in the backseat with Petitioner in the middle and Abella behind the driver's seat. *Id* at 7-8. Petitioner asked Abella to return the watch, but he refused. *Id.* at 7. Petitioner told him to "stop playing" and held Abella's arm and tried to take the watch. *Id.* Abella punched Petitioner in the face, and they began fighting. *Id.* Neither of them had a weapon. *Id.* at 8. The other man in the backseat, who Petitioner referred to both as Eric and Shango, told them to stop fighting and got out of the car while the female stayed in the front seat. *Id.* at 37, 72. Abella opened the door and grabbed a knife from the door panel with his right hand. *Id.* at 9. Petitioner grabbed Abella's right hand as they exited the car and attempted to disarm Abella who was resisting by twisting Petitioner's hand. *Id.* at 9-10. He used two hands to hold and twist Abella's hand, which caused the knife to fall to the ground. *Id.* at 10. Petitioner kicked the knife behind him, and they continued fighting until Abella ran

away. *Id*. at 10-11.

Petitioner, in order to get his watch, chased Abella a short distance to a house where Abella picked up a three-foot metal pipe. *Id*. at 11-12. Abella hit Petitioner with the pipe numerous times on the shoulder, back, hand and face, and Petitioner ran away because he was unarmed and could not defend himself. *Id*. at 12-13. Abella followed, hitting Petitioner in the back with the pipe as Petitioner picked the knife up off the ground and told Abella to get back. *Id*. at 14-15. Abella continued to hit him with the pipe, including hitting his hand and knocking the knife to the ground, whereupon Petitioner grabbed Abella in a bear hug and took the pipe away. *Id*. at 15-17. Abella tripped over backward, said he did not want to fight anymore, and threw the watch into the street. *Id*. at 17-18. Petitioner picked up the watch, pointed out to Abella that there were people approaching who were calling the police because they had been fighting, and said "let's go." (*Id*. at 18.) Abella refused to leave with Petitioner and told him: "You should know I'm going to get my gun, and I'm coming to look for you." *Id*. Petitioner told him: "Yes. Come and find me," and left. *Id*. Petitioner said he was unaware Abella had been injured. *Id*.

Two days later, on January 3, 2018, about 6:00 p.m., Petitioner received a phone call from Abella asking to forgive him for what happened and asking where he was. *Id*. at 19. Petitioner told him he forgave him and told him he was in his car parked where he normally parked, but instead of coming to see him Abella sent the police. *Id*. Petitioner and a friend were outside his car when the police arrived and arrested him. *Id*. Petitioner said he was homeless and often slept in his car in dangerous high crime areas and kept the knife in the car for protection, and Abella knew he kept the knife in the car. *Id*. at 20-22. He said he did not have an interpreter or an attorney when questioned by police after his arrest and felt like the police were "disturbing my spirit" and not listening to him. *Id*. at 23-24. He admitted he had a 2014 theft conviction as a result of a guilty plea. *Id*. at 25. He identified the female in the car as a friend named Nunu and said he had known her and Shango, who he also referred to as Eric, for two years. *Id*. at 27-28. He said he

8

asked his defense attorney to locate them, but counsel was unable to do so as they were both homeless. *Id*. at 70-71. The defense rested. *Id*. at 78.

The People recalled Officer Tani who testified in rebuttal that he briefly interviewed Petitioner after his arrest, during which he never said anything about being beaten with a pipe, never asked for an interpreter, and conversed in English. *Id*. at 79-83. Officer Tani said the police never received information about Petitioner's location from Abella. *Id*. at 83. The jury was shown a portion of Officer Tani's body-worn camera footage showing Petitioner's injuries. *Id*. at 80.

The final witness, Andrew Logan, a San Diego Police Officer, testified for the prosecution that after the police identified Petitioner through his Facebook moniker Cash Man, Abella identified him from a photographic lineup but was unable to provide a first or last name. *Id*. at 88-89. Abella never provided a location where Petitioner could be found or arrested. *Id*. at 89. Officer Logan interviewed Petitioner in jail on January 4, 2018. *Id*. at 89-90. Petitioner was read a *Miranda* advisal and answered yes when asked if he understood his rights and wanted to talk. *Id*. at 90-91. They spoke in English and Petitioner never asked for a translator. *Id*. at 91. During their 40-minute interview, Petitioner never said Abella hit him with a pipe or threatened him with a gun and never said he and Abella were close friends. *Id*. at 91-92. He said there were two other people in the car, a male and a female, but he only knew the first name of the male, Eric, and only knew Facebook information of the female. *Id*. at 92. Petitioner said Abella had a knife which Petitioner was able to take away because he is bigger and stronger than Abella, and told Officer Logan that he did not punch, hit or stab Abella and that Abella must have cut himself during their struggle over the knife. *Id*. at 93-94. Petitioner told Officer Logan he was frustrated because he was the victim since Abella stole his watch. *Id*. at 99.

As relevant to claims one and three here, the prosecutor requested a mutual combat instruction which, as set forth below, provided that if Petitioner started the fight or engaged in mutual combat, he had a right to self-defense only if he actually and in good

faith tried to stop fighting, indicated by word or by conduct in a way that a reasonable person would understand that he wanted to stop fighting and had stopped fighting, and gave Abella a chance to stop fighting.  The prosecutor argued the instruction was supported by the evidence but was interrupted before explaining why.  *Id*. at 150-51.  Defense counsel opposed it as inconsistent with the defense theory of self-defense but was also interrupted before explaining why.  *Id*. at 151-52.  The trial judge refused the instruction based on the bench note stating: "The court must instruct on a defense when a defendant requests it and there is substantial evidence supporting the defense.  The court has a sua sponte duty to instruct on a defense if there is substantial evidence supporting it and either the defense is relying on it or it is not inconsistent with the defendant's theory of the case."  *Id*. at 152; Doc. No. 7-13 at 34.  Defense counsel argued to the jury that Petitioner and Abella were engaged in mutual combat, and under the self-defense instruction they received Petitioner was entitled to use reasonable force to protect himself as long as he reasonably believed Abella posed a threat, and that he was not required to retreat and could continue to pursue Abella until the threat was gone, provided he did not contrive a need for self-defense and did not use more force than was necessary to protect himself, and argued that Abella's injury was accidental or incidental to Petitioner's reasonable acts of self-defense.  *See* Doc. No. 7-8 at 215-29; Doc. No. 7-9 at 3-5.  The jury deliberated about five hours, which included a one and one-half hour readback of Petitioner's testimony, before finding him guilty of assault with a deadly weapon with the personal use of a deadly weapon and personal infliction of great bodily injury.  *See* Doc. No. 7-1 at 176-78.

## IV.   Petitioner's Claims

Petitioner seeks a writ based on the following claims:

(1)  The trial court's failure to sua sponte give a mutual combat jury instruction violated Petitioner's rights to a fair trial and due process as protected by the Fifth, Sixth and Fourteenth Amendments.  *See* Doc. No. 1 at 6, 11.

(2)  The imposition of fines and fees without a determination regarding Petitioner's

ability to pay violated his right to due process as protected by the Fifth and Fourteenth Amendments.  *Id*. at 7, 12.

(3)  Defense counsel's objection to the use of a mutual combat instruction constituted ineffective assistance of counsel in violation of Petitioner's rights protected by the Sixth and Fourteenth Amendments.  *Id*. at 7, 12.

## V.  Discussion

As set forth below, habeas relief is unavailable because claim one is procedurally defaulted and Petitioner has failed to excuse the default, claim two does not present a cognizable federal habeas claim, and the state court adjudication of claims one and three is neither contrary to nor an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.

### A.    Legal Standards

Under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, in order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's

20cv1870-MMA (BGS)

case." *Id.* at 407.  In order to satisfy § 2254(d)(2), the factual findings relied upon by the state court must be objectively unreasonable.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## B.   Claim one

Petitioner alleges in claim one that his rights to a fair trial and due process under the Fifth, Sixth and Fourteenth Amendments were violated by the failure to sua sponte instruct the jury on mutual combat.  *See* Doc. No. 1 at 6, 11.  Respondent answers that: (1) the claim is procedurally defaulted because the state court found it forfeited under the invited error doctrine due to defense counsel's opposition to the instruction, (2) such a claim does not present a federal constitutional issue where, as here, it does not rise to the level of a due process violation, and (3) in any case the state court adjudication of the claim is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).  *See* Doc. No. 6-1 at 12-18.

Petitioner presented this claim to the state appellate and supreme courts on direct appeal.  *See* Doc. Nos. 7-13, 7-20.  The appellate court denied the claim in a reasoned opinion and the supreme court summarily denied review.  *See* Doc. No. 7-21.  The Court applies 28 U.S.C. § 2254(d) to the last reasoned state court decision, the appellate court opinion on direct appeal.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground.").  The appellate court stated:

> During the jury instruction conference, the prosecutor proposed instructing the jury with CALCRIM 3471. This instruction would have informed the jury, "A person who (engages in mutual combat (or who) starts a fight) has a right to self-defense only if: (¶) 1. (He/She) actually and in good faith tried to stop fighting; (¶) (AND) (¶) 2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;) . . . (¶) (AND) (¶) 3. (He/She) gave (his/her) opponent a chance to stop fighting.)  (¶)  If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.  (¶)  (However,

12

if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent(, or give the opponent a chance to stop fighting).)  (¶) (A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.)"  (CALCRIM 3471.)

Defense counsel objected to the instruction, arguing the instruction was a defense instruction, she did not request the instruction, and the instruction was inconsistent with the defense theory of the case.  After reviewing the bench notes for the instruction, the court declined to give the instruction.

Notwithstanding defense counsel's objection, Irakunda contends we must reverse the judgment because the court failed to give the instruction on the court's own motion.  "We review a claim of instructional error de novo. (Citation.)"  (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)

"'"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  (Citations.)  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (Citation.)'"  (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)  [¶] "In the case of defenses, . . . a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'  (Citation.)  Thus, when the trial court believes 'there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.' (Citation.)"  (*Breverman, supra*, 19 Cal.4th at p. 157.)

Here, the defense theory of the case was that Irakunda acted in reasonable self-defense and the victim's injury was the accidental or incidental result of Irakunda's reasonable self-defense.  Defense counsel objected to the CALCRIM 3471 instruction because Irakunda was not relying on a mutual combat defense and defense counsel considered the instruction inconsistent with the defense theory of the case.  "'"When a defense attorney makes a "conscious, deliberate tactical choice" to (request or) forego a

particular instruction, the invited error doctrine bars an argument on appeal that the instruction was (given or) omitted in error.' (Citations.)" (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.) Consequently, Irakunda has forfeited his challenge to the court's failure to give the CALCRIM 3471 instruction.

Although "a defendant who is barred from raising instructional error by the invited error doctrine may 'always claim he received ineffective assistance of counsel(,)' . . . (¶) . . . the defendant must show that there was no rational tactical purpose for counsel's act or omission, and that it is reasonably probable that, absent counsel's deficiencies, a more favorable result would have been obtained. (Citations.)" (*People v. Wader* (1993) 5 Cal.4th 610, 658.) Irakunda cannot make this showing because the CALCRIM 3471 instruction limits the availability of self-defense. (See, e.g., *People v. Rogers* (1958) 164 Cal.App.2d 555, 558 (concluding mutual combat instruction caused the jury to reject all claims of self-defense and prejudiced the defendant).) Since self-defense was the defense theory of the case and defense counsel did not want to undermine that theory, defense counsel had a rational tactical purpose for objecting to the CALCRIM 3471 instruction.

Doc. No. 7-19, *People v. Irakunda*, No. D074094, slip op. at 6-9.

Respondent first argues claim one is procedurally defaulted based on the invited error doctrine and that Petitioner is unable to excuse the default by showing cause and prejudice or that new reliable evidence shows he is not guilty. *See* Doc. No. 6-1 at 12-15. In order to preclude federal habeas review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to bar federal review. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). To be "independent" the state law basis for the decision must not be interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983). In order to be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. Bean*, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. *Bennett v. Mueller*,

322 F.3d 573, 586 (9th Cir. 2003).  If Respondent is successful, the burden shifts to Petitioner to challenge the independence or adequacy of the procedural bar.  *Id.*

Respondent has carried the initial burden by identifying California's invited error doctrine as precluding federal review of this claim and contending it is clearly established and consistently applied.  *See* Doc. No. 6-1 at 13 (citing *Leavitt v. Arave*, 371 F.3d 663, 685 (9th Cir. 2004), amended and superseded on denial of rehearing by *Leavitt v. Arave*, 383 F.3d 809, 832-33 (9th Cir. 2004) (recognizing that invited error doctrine can support a procedural default if it is clearly established and consistently applied) (citing *Bennett*, 322 F.3d at 580))).  Because Petitioner has not filed a Traverse or responded to Respondent's contention, he has failed to satisfy his burden of challenging the independence or adequacy of the state procedural bar, and claim one is procedurally defaulted without Respondent being required to establish that California's invited error doctrine is in fact clearly established and consistently applied.  *Bennett*, 322 F.3d at 586.

The Court can address the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or if a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim.  *Coleman*, 501 U.S. at 750.  Petitioner alleges in claim three that his trial counsel was ineffective for objecting to the use of the mutual combat instruction, which, if true, could establish cause to excuse the default.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires the responsibility for the default be imputed to the State.").  However, as set forth in the discussion of clam three below, Petitioner has not established constitutionally ineffective assistance of trial counsel in objecting to the use of the instruction.  He is also unable to establish prejudice to excuse the default since he would not be entitled to federal habeas relief even were the Court to address the merits of the claim because as discussed immediately below no federal due process violation arose from the failure to give the mutual combat instruction.  He has therefore failed to demonstrate cause and prejudice to excuse the default.  In light

of the fact that the evidence of Petitioner's guilt turned primarily on a jury determination of the credibility of the contrasting testimony of Petitioner and Abella, no fundamental miscarriage of justice would result from the default.  *See Schlup v. Delo*, 513 U.S. 298, 316 (1995) (holding that a showing of fundamental unfairness needed to overcome a procedural default requires a presentation of "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial."); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (holding that federal habeas courts must consider the evidence "in the light most favorable to the prosecution," and must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences by assuming the jury resolved all conflicts in a manner supporting the verdict); *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("The jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality."); *Schlup*, 513 U.S. at 330 ("under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.").

Accordingly, habeas relief is denied as to claim one on the basis it is procedurally defaulted and because Petitioner has established neither cause nor prejudice to excuse the default nor shown a fundamental miscarriage of justice would arise as a result of the Court failing to reach merits of the claim due to the default.

Furthermore, even if the default could be overcome, the failure to instruct on a defense theory does not present a claim cognizable on federal habeas unless it rises to the level of a due process violation.  For the following reasons, no due process violation occurred, but even if it did the state court adjudication of claim one is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts.

In order to rise to the level of a federal constitutional error, an instructional error must have "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Petitioner is "entitled to adequate instructions on his or her theory of

defense." *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984); *Bradley v. Duncan*, 315 F.3d 1091, 1098-1101 (9th Cir. 2002).  Petitioner bears a "heavy burden" of showing the instruction should have been given and the failure to instruct "so infected the entire trial that the resulting conviction violates due process." *California v. Roy*, 519 U.S. 2, 5 (1996) (quoting *Cupp*, 414 U.S. at 147).

The jury was provided with two starkly contrasting versions of the events.  As detailed above, Abella testified that when he refused to get out of the car Petitioner dragged him out while hitting him with something like a screwdriver and telling him he was going to teach him a lesson.  Abella ran, was chased by Petitioner, picked up a short, light-weight piece of plastic pipe and took a defensive posture without swinging it at Petitioner.  Petitioner responded by retrieving a military-style knife from the car and slashing or stabbing Abella while he held his empty hands out in a gesture of surrender or non-aggression.  Petitioner only retreated when, as an independent witness also testified, he was approached by people calling the police.  In contrast, Petitioner testified he and Abella had peacefully settled their dispute and were celebrating the new year when Petitioner attempted to take the watch off Abella's wrist in the car, prompting Abella to punch Petitioner in the face and grab the knife, which Petitioner struggled to take away.  When the knife fell to the ground and Petitioner kicked it behind him, Abella ran.  When Petitioner gave chase to get his watch, Abella picked up a long metal pipe with which he struck Petitioner many times, to which Petitioner reacted by going back and picking up the knife which Abella then knocked out of his hand with the pipe.  Petitioner grabbed Abella in a bear hug and managed to take the pipe away by being bigger and stronger, after which Abella tripped over backward and surrendered the watch, ending their fight.  When Petitioner offered to give him a ride home, Abella threatened to come back at Petitioner with a gun at some later time.  Petitioner told the police he did not punch, hit or stab Abella, that he thought Abella must have cut himself, and never mentioned being attacked with a metal pipe or threatened with a gun.  Petitioner's trial defense was that Abella must have been inadvertently or accidentally cut while Petitioner was trying to

take the knife away at the outset of their struggle or while he was defending himself from repeated blows with the metal pipe.

As the state court noted, the mutual combat instruction provided that Petitioner had a right to self-defense if he started the fight or engaged in mutual combat only if: (1) he in good faith tried to stop the fight, (2) indicated in words or actions to Abella which a reasonable person would understand that he wanted to stop fighting and in fact stopped fighting, and (3) gave Abella a chance to stop fighting.  It is clear that a mutual combat instruction was not supported by Abella's testimony that Petitioner attacked him in the car, chased him with the knife when he ran away, that he only ever tried to defend himself with a light-weight plastic pipe he never swung at Petitioner and dropped when Petitioner brandished the knife with which he cut Abella while he holding his arms out with his empty hands in a gesture of helplessness, and that Petitioner's attack only stopped when someone approached and called the police.

The instruction was also inconsistent with Petitioner's testimony that it was only after he and Abella had peacefully resolved their dispute that Abella punched him in the face, grabbed the knife, grabbed a metal pipe when Petitioner chased him after forcing him drop the knife, and that Abella continued hitting Petitioner until he was forced to drop the pipe.  Both versions lack evidence Petitioner indicated by words or deeds he wanted to stop fighting and had stopped fighting.  Although Petitioner testified that he retreated from Abella's blows with the pipe, he said he did so in order to pick up the knife to defend himself, not to stop fighting.  He did not run away at that point and did not stop fighting until Abella told Petitioner he wanted to stop fighting and surrendered the watch.

In addition to the lack of an evidentiary support for the instruction, Petitioner's theory of self-defense at trial was that Abella was accidentally or inadvertently cut while Petitioner was forced to defend himself from a sudden, unexpected, and unprovoked attack from which he was not obliged to retreat.  As discussed below in the claim that defense counsel was ineffective for opposing the instruction, that was a much stronger

defense than one based on a theory that Petitioner had to defend himself during a fight he started or they mutually agreed to start without any evidence whatsoever that he indicated in words or actions to Abella that he wanted to stop fighting and had in fact stopped fighting as necessary to support the instruction, or with what would certainly be a strained argument to the jury by defense counsel that was what the evidence showed.

Petitioner has not overcome his "heavy burden" of establishing that the failure to give a mutual combat instruction rendered his trial unfair. *See Roy*, 519 U.S. at 5 (holding that to establish a federal due process violation arising from the omission of a jury instruction, a petitioner must overcome an "especially heavy" burden of showing that the omitted instruction should have been given and that its omission "so infected the entire trial that the resulting conviction violates due process."). The state court adjudication of claim one is therefore neither contrary to, nor an unreasonable application of, clearly established federal law. Neither has Petitioner shown the state court adjudication involved an unreasonable determination of the facts. *Miller-El*, 537 U.S. at 340.

Accordingly, the Court denies habeas relief as to claim one because it is procedurally defaulted, and because even if Petitioner could overcome the default, the rejection of the claim by the state court is objectively reasonable within the meaning of 28 U.S.C § 2254(d).

## C.     Claim Three

Petitioner alleges in claim three he received constitutionally ineffective assistance of counsel by his trial counsel's objection to the use of the mutual combat instruction. *See* Doc. No. 1 at 7, 12. Respondent answers that the state appellate court's denial of this claim, on the basis counsel had a reasonable tactical decision to oppose the instruction and there was no prejudice because the evidence did not support the instruction, does not involve an unreasonable application of clearly established federal law. *See* Doc. No. 6-1 at 19-20.

As quoted above, the appellate court stated:

> Although "a defendant who is barred from raising instructional error by the invited error doctrine may 'always claim he received ineffective assistance of counsel(,)'" . . . (¶) . . . the defendant must show that there was no rational tactical purpose for counsel's act or omission, and that it is reasonably probable that, absent counsel's deficiencies, a more favorable result would have been obtained. (Citations.)" (*People v. Wader* (1993) 5 Cal.4th 610, 658.) Irakunda cannot make this showing because the CALCRIM 3471 instruction limits the availability of self-defense. (See, e.g., *People v. Rogers* (1958) 164 Cal.App.2d 555, 558 (concluding mutual combat instruction caused the jury to reject all claims of self-defense and prejudiced the defendant).) Since self-defense was the defense theory of the case and defense counsel did not want to undermine that theory, defense counsel had a rational tactical purpose for objecting to the CALCRIM 3471 instruction.

Doc. No. 7-19, *People v. Irakunda*, No. D074094, slip op. at 8-9.

For ineffective assistance of counsel to provide a basis for federal habeas relief, Petitioner must show counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He must also show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id*. To show prejudice, Petitioner need only demonstrate "a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. The standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

As to the first *Strickland* prong, Petitioner has not overcome the strong presumption that his counsel's objection to the instruction was "within the wide range of

reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (recognizing a strong presumption counsel took actions "for tactical reasons rather than through sheer neglect") (citing *Strickland*, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment)).  Defense counsel opposed the mutual combat instruction on the basis that a mutual combat defense "is not a defense that is consistent with the defense theory of the case . . . ." Doc. No. 7-8 at 151-52.  Because as discussed above in claim one a mutual combat instruction was unsupported by the trial testimony, the state court correctly found that the decision by defense counsel to oppose the instruction as inconsistent with the defense presented at trial under which Petitioner did not have to retreat to which counsel was arguably constrained by Petitioner's own testimony, amounted to a reasonable tactical decision.  The state court application of the *Strickland* performance prong is therefore objectively reasonable.  *Strickland*, 466 U.S. at 687 (holding that deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."); *see also id.* at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.").

The state court also correctly found there was no *Strickland* prejudice because there was no reasonable probability the outcome of the trial would have been different if the mutual combat instruction was given, and that it may have even prejudiced the defense of self-defense.  *See* Doc. No. 7-19, *People v. Irakunda*, No. D074094, slip op. at 8-9 (citing *Rogers*, 164 Cal.App.2d at 558 (finding mutual combat instruction prejudiced defendant by causing jury to reject claim of self-defense)).  The mutual combat instruction would have undermined Petitioner's defense that Abella was cut accidentally or inadvertently while Petitioner defended himself from a vicious, sudden, unexpected, and unprovoked attack rather than while defending himself during a fight he started or both parties agreed to initiate.  Under the mutual combat instruction Petitioner would

have been required to prove he communicated to Abella that he wanted to stop the fight and did in fact stop fighting, which is not supported by the testimony of Petitioner or Abella or any other evidence in the record, including the bystander who testified Petitioner ran away only at the threat of calling the police.  In fact, defense counsel argued in closing in support of the theory of self-defense: "This is important.  The defendant is not required to retreat."  Doc. No. 7-8 at 217.  Even assuming Petitioner could have argued that his testimony that Abella hit him in response to his attempt to take the watch of Abella's wrist could have been viewed by the jury as Petitioner having started the fight or a mutually agreed initiation of hostilities within the meaning of the mutual combat instruction, he has not shown the instruction would have permitted the jury to accept his defense of self-defense more readily than the stronger defense presented at trial that Abella initiated an unwanted, unwelcome and unavoidable fight which Petitioner tried to deescalate by forcing the knife out of Abella's hand and kicking it behind him, but which he was permitted to pick up to use to continue fighting rather than retreat from Abella's blows with the metal pipe.  Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" required to demonstrate *Strickland* prejudice by counsel's objection to the mutual combat instruction.  *See Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."); *Strickland*, 466 U.S. at 687 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.").

Accordingly, the Court denies habeas relief as to claim three because the state court adjudication is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).

### D.   Claim Two

In his final claim, Petitioner argues that the imposition of fines and fees without a determination regarding his ability to pay violated his right to due process as protected by

the Fifth and Fourteenth Amendments.  *See* Doc. No. 1 at 7, 12.  Respondent answers that this claim is procedurally defaulted as a result of finding by the state court that it was forfeited by the failure to raise the claim at sentencing, and that in any case it does not present a cognizable federal claim.  *See* Doc. No. 6-1 at 21-23.

The last reasoned state court opinion regarding of this claim is the appellate court order denying habeas relief, which states:

> As part of Irakunda's sentence, the court imposed a restitution fine of $2,100; a corresponding parole revocation fine of $2,100, which the court stayed unless parole is revoked; a court facilities assessment of $30; a court operations assessment of $40; and a booking fee of $154.  Relying on the recent decision in *Dueñas, supra*, 30 Cal.App.5th 1157, Irakunda requests we stay the fines and vacate the fee and assessments because the court violated his due process rights by imposing them without first determining he had the present ability to pay to them.

> We conclude Irakunda has forfeited this issue by failing to object to the fines, fee, and assessments on this basis at the sentencing hearing.  (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155, but see *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 (no forfeiture because *Dueñas* announced a new, unanticipated constitutional principle); *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 (no forfeiture because the holding in *Dueñas* was an unforeseeable change in the law).)  Since the court imposed more than the minimum restitution fine, Irakunda had an incentive and the ability to object to the imposition of the fine based on his inability to pay. (Pen. Code, § 1202.4, subd. (c); *Gutierrez*, at p. 1033; *Frandsen*, at pp. 1153–1154.)  He could have made the same objection to the other fine, the fee, and the assessments.  (*Frandsen*, at pp. 1154-1155.)  By remaining silent, he forfeited his challenge to the fines, fee, and assessments. (*Gutierrez*, at p. 1033; *People v. Frandsen*, at pp. 1153-1155.)

Doc. No. 7-19, *People v. Irakunda*, No. D074094, slip op. at 9-10.

There is no need to address Respondent's contention this claim is procedurally defaulted by the failure to object at sentencing because the Court is without jurisdiction to address the claim on federal habeas.  *See Bailey v. Hill*, 599 F.3d 976, 981 (9th Cir. 2010) (holding that district court lacked jurisdiction under 28 U.S.C. § 2254 to a challenge to a

restitution order because success on the claim would not impact the length or validity of petitioner's custody).  Habeas relief is denied as to claim two for want of jurisdiction.

A district court may construe a habeas petition which presents claims which do not lie at the core of habeas as a civil rights complaint pursuant to 42 U.S.C. § 1983 "after notifying and obtaining informed consent from the prisoner." *Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016).  "If the complaint is amenable to conversion on its face, meaning it names the correct defendants and seeks the correct relief, the court may recharacterize the petition so long as it warns the *pro se* litigant of the consequences of the conversion and provides an opportunity for the litigant to withdraw or amend his or her complaint." *Id.* at 936.  The Court declines to do so here because the petition is not amenable to conversion on its face as there are no allegations against the named Respondent in this action (the Warden of the Prison where Petitioner is presently confined), and it is unclear who Petitioner seeks to hold personally responsible for the alleged denial of his federal rights.  *See e.g.*, *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.").  In addition, construing this action as one brought pursuant to 42 U.S.C. § 1983 could expose Petitioner to the provisions of the PLRA, one of which provides that the entire $350 civil filing fee must be collected even if he qualifies to proceed in forma pauperis and regardless of whether his action is ultimately dismissed as untimely.  *Bruce v. Samuels*, 577 U.S. 82, 84 (2016).

The Court declines to construe this action as a civil rights complaint pursuant to 42 U.S.C. § 1983.  *See Nettles*, 830 F.3d at 936.  The denial of habeas relief with respect to claim two is without prejudice to Petitioner to pursue the claim in an action other than a federal habeas petition.

## VI.   Certificate of Appealability

The Court is required to grant or deny a Certificate of Appealability when entering a final order adjudicating a 28 U.S.C. § 2254 habeas petition.  *See* Rule 11, rules foll. 28

U.S.C. § 2254.  "[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented [including procedural issues] are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017).  Under that standard, the Court finds that a Certificate of Appealability is not appropriate as to any claim or procedural issue presented in the Petition.

## VII.   Conclusion and Order

Based on the foregoing, the Court **DENIES** the petition for a writ of habeas corpus and **DECLINES** to issue a Certificate of Appealability.  The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED**.

DATE: April 14, 2021

HON. MICHAEL M. ANELLO
United States District Judge